PEOPLE v BURNETT

Docket No. 95523. Submitted January 7, 1988, at Lansing. Decided March 7, 1988. Leave to appeal applied for.

Elmer J. Burnett was convicted of conspiracy to commit first-degree murder and arson, arson, breaking and entering with intent to commit murder, two counts of first-degree murder, three counts of assault with intent to murder and possession of a firearm during the commission of a felony following a jury trial in the Genesee Circuit Court before Judge Earl E. Borradaile. Defendant appealed.

The Court of Appeals *held:*

1. Defendant's claim that the prosecutor used only innuendo and hearsay testimony to demonstrate defendant's involvement in drug trafficking and improperly referred to his girlfriend's house as defendant's drug house is without merit.

2. Defendant's claims that he was denied a fair trial by the trial court and as a result of the prosecutor's conduct at trial are without merit.

3. Any error in the admission of evidence of a revolver acquired by defendant after he fled the state and a receipt for its purchase was harmless.

4. Defendant was not denied the effective assistance of counsel.

5. The trial court improperly instructed the jury on the requisite intent for assault with intent to murder. Defendant's convictions on three counts of assault with intent to murder are reversed and remanded for a new trial. Defendant's convictions and sentences for conspiracy to commit first-degree murder and arson, breaking and entering with intent to commit murder, two counts of first-degree murder and felony firearm are affirmed.

Affirmed in part, and reversed and remanded in part.

1. CRIMINAL LAW — TRIAL — JOINDER.

Offenses may be joined for trial when they are based on the same

REFERENCES

Am Jur 2d, Criminal Law § 291.
Am Jur 2d, Homicide §§ 568-582.
What constitutes attempted murder. 53 ALR3d 612.

conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

2. CRIMINAL LAW — PROSECUTORIAL MISCONDUCT.

The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial; questions of such misconduct are decided on a case-by-case basis by evaluating the wrongful act in the context of the record.

3. CRIMINAL LAW — ASSAULT WITH INTENT TO MURDER — INTENT.

A defendant may be found guilty of assault with intent to murder only if there is an actual intent to kill; an intent to place the victim in fear of being murdered is insufficient (MCL 750.83; MSA 28.278).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Robert E. Weiss,* Prosecuting Attorney, *Donald A. Kuebler,* Chief, Appellate Division, and *Edwin R. Brown,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Mardi Crawford),* for defendant on appeal.

Before: CYNAR, P.J., and BEASLEY and K. B. GLASER,* JJ.

BEASLEY, J. Defendant, Elmer James Burnett, was convicted by a jury of conspiracy to commit first-degree murder and arson, contrary to MCL 750.157a; MSA 28.354(1), arson, contrary to MCL 750.72; MSA 28.267, breaking and entering with intent to commit murder, contrary to MCL 750.110; MSA 28.305, two counts of first-degree murder, contrary to MCL 750.316; MSA 28.548, three counts of assault with intent to murder, contrary to MCL 750.83; MSA 28.278, and possession of a firearm during the commission of a felony, contrary to MCL 750.227b; MSA 28.424(2). Defendant was sentenced to serve concurrent

* Circuit judge, sitting on the Court of Appeals by assignment.

terms of life on the conspiracy to commit first-degree murder and arson convictions, not less than thirteen nor more than twenty years on the arson conviction, not less than ten nor more than fifteen years on the breaking and entering with intent to commit murder conviction, life on both first-degree murder convictions, life on all three assault with intent to murder convictions, and a two-year consecutive sentence for the felony-firearm conviction. Subsequently, defendant's delayed application for leave to appeal was granted by this Court.

In order to understand the various peripheral arguments defendant makes on appeal, it is necessary first to review the prosecutor's case.

The prosecutor's theory at trial was that defendant intended to kill Robert Anderson, Thomas Batson, and a man named Mafete because of their interference with his drug business. The prosecutor elicited testimony from Gloria Ruffin, Bonnie Davis, James Anderson, Marilyn Walton, Thomas Batson and Nathaniel Grover concerning their involvement and defendant's involvement in drug trafficking.

The events that gave rise to these gruesome crimes began during the evening on December 10, 1984, and continued through the night to the morning of December 11, 1984. Defendant was accompanied at various times by Nathaniel Grover, Robert Thompson, and Curtis Montana Philpots. At approximately 10:00 P.M. on December 10, 1984, Grover received a message from a young man that defendant and Robert Anderson had had a dispute. Grover was told that defendant wanted him to bring defendant the "defender," a 12-gauge shotgun. At the time, Grover was at Gloria Ruffin's home, she being his girlfriend with whom he had lived for the past four months. Grover sold drugs out of Gloria's home.

Grover brought the "defender" to defendant and also carried with him a .38 caliber automatic pistol and a .357 caliber revolver. Defendant was at Bonnie Davis' home, she being his girlfriend. Bonnie Davis and defendant sold drugs out of her home. When Grover arrived at Davis' home, defendant told Grover that some guys, including Robert Anderson and Mafete, had "disrespected" him and that they were expected to return. Grover drove defendant over to defendant's wife's home. As they were on their way, defendant and Grover saw a Nova which they believed belonged to Robert Anderson. Defendant told Grover to follow the Nova, drive around the block, park and wait for him. Defendant got out of the car, took the "defender" with him, and fired three or four shots at the Nova. Defendant returned to the car and told Grover that "[he] got that bitch."

Renaldo Hutson was driving the Nova at the time, and he was hit in the shoulder and hospitalized. Hutson did not know defendant.

Grover proceeded to drive defendant to his wife's home where defendant either changed clothes or put some in the washing machine and told Grover to clean the "defender." Defendant and Grover returned to Gloria Ruffin's home around midnight or 1:00 A.M., where they began to drink, smoke marijuana and do cocaine.

Thompson and Philpots arrived at Ruffin's home around 2:00 A.M., after stopping at Bonnie Davis' home to look for defendant. She had told them about the incident with Robert Anderson. Thompson and Philpots asked defendant what he wanted to do about the incident, and they decided to shoot at and burn Robert Anderson's home.

All of the men put on gloves and defendant, Grover and Philpots armed themselves. Grover carried a .357 magnum and the "defender," defen-

dant carried a 12-gauge pump shotgun, and Philpots carried a .38 caliber automatic pistol. Defendant, Grover, Thompson and Philpots all drove over to Bonnie Davis' home. Grover sent Philpots to get a rifle which he gave to Thompson upon Philpots' return to the car. Then they all drove to a gas station where Grover and Thompson filled an empty container with gasoline. They then drove over to Robert Anderson's home and parked around the corner from it. Philpots made four firebombs out of the gasoline and some empty beer bottles and gave one each to defendant, Grover and Thompson. By now it was around 3:00 or 3:30 A.M. and they all walked to Robert Anderson's driveway.

Philpots lit his firebomb and ran to the back of Anderson's home. Grover lit his firebomb and threw it into the back door. Grover ran around to the front of the home after hearing gunshots coming from that direction. As he got there, Grover saw Philpots running away from the home, and Thompson was standing behind a tree in the front of the home with a .30-06 rifle. Defendant apparently was in the back of the home and came out front shortly afterwards with a 12-gauge shotgun. Grover called Philpots back to the home and they all stood in front of the home and shot at it.

Robert Anderson's mother, Barbara, and Robert were both hit by the shots fired into their home. Barbara was wounded and Robert was killed. After firing approximately twenty shots, they left. Philpots and Thompson drove off in the car and defendant and Grover began walking. As they walked through the neighborhood, defendant began shooting at the houses. One of defendant's bullets went through the front window of Lisa Carr's home, and a piece of glass hit her in the face.

Philpots and Thompson came around the corner

in the car, and defendant and Grover shot at it. They ceased firing after Philpots yelled that it was the wrong car. Defendant and Grover got into the car with Philpots and Thompson, and they all drove back to Gloria Ruffin's home, taking all of the guns into her home except for the .357 pistol.

While they were in the house, Thompson and Philpots began to discuss Thomas Batson. They thought that Batson was a "snitch" and wanted to get him out of his apartment so that Philpots could sell drugs out of the apartment. Defendant interrupted the conversation and yelled at the others for not waiting until the Andersons came out of their home to shoot. Defendant felt that only Thompson did it correctly. At some time during the conversation, they realized that the .357 pistol was missing and defendant went out to the car to retrieve it. While defendant was retrieving the pistol, Thompson stated that defendant took the .30-06 rifle from him at the Anderson home and began shooting it.

Eventually, they all began loading their guns to go over to Thomas Batson's apartment. Defendant stated that he was going to kill Batson, and Philpots stated that defendant would not have to because he would do so. Defendant told Grover that he did not have to go over to Batson's apartment because he was too drunk. Grover gave defendant the keys to his car, and Philpots drove his own car.

Defendant, Thompson and Philpots arrived at Batson's apartment around 7:00 A.M. Batson was not at home, but Marilyn Walton, the downstairs tenant, heard talking and shooting coming from Batson's apartment. Defendant and the others shot at the back door, bed, refrigerator, walls and floor of the apartment. Some of the shots came through the ceiling into Marilyn Walton's apartment. Dur-

ing the course of all this, Marilyn Walton received a call from Philpots telling her not to go outside or look out of the window. The shooting in Batson's apartment continued for about ten minutes, then defendant and Thompson began to run down the street and shoot their guns.

A group of children, including Ray Parker, Jr., age eleven, and Alpha Breed, age fourteen, were standing at a church waiting for their school bus. Defendant and Thompson approached the children and began shooting at them. Parker was hit and died after receiving four gunshot wounds to his body. Breed, who was hit in the thigh, testified that the gunmen deliberately aimed at Parker and him and shot them. The other children scattered about the area. Defendant and Thompson ran between the houses near Eldridge and Flint Park Boulevard.

Ladale Woods, a police officer for the City of Flint who lived in the vicinity, was leaving for work around 7:30 A.M. that morning. As he was leaving his home, Officer Woods heard "three loud bangs" and saw defendant and Thompson run in between the houses. Officer Woods drove his cruiser down the street looking in between the houses.

In the meantime, defendant had run between two homes and was leaning against Marilyn Rembert's home near her bedroom window. She watched defendant as he stood against her home and loaded his gun. As he was doing so, defendant kept looking out towards the street and around the corner. By now, Officer Woods had backed up to the corner and began driving down the street again looking in between the homes. As he drove, defendant ran into the street, stood behind Officer Woods' cruiser, and fired three shots at him. The third shot entered the cruiser and Officer Woods

radioed for assistance. Defendant ran between the homes, and Officer Woods backed up to find him. Officer Woods drove a short distance, and defendant reappeared in front of him and fired two more shots. Officer Woods shot back at defendant, who then fired back at Woods and ran between the houses.

Thompson had run back to Marilyn Walton's home, went inside, took off all his clothes but his pants and told the police he did not know what had happened. Thompson was arrested that morning.

Defendant managed to return to Gloria Ruffin's home, where he told Grover that Thompson had been arrested and that he had shot at a police car with a pistol and also shot a little boy. Defendant and Grover then drove over to see if Thompson had been arrested and turned around when they saw the police. On the way back to Ruffin's home, the police stopped them. They were released because the police could not tie them to the incidents.

Grover was arrested on December 12, 1984, at Gloria Ruffin's home. The police also seized six or seven shotguns and a pistol. On December 11, 1984, the police went to Bonnie Davis' home looking for defendant. He was not there, but the police seized a .30-06 rifle and a shotgun from the Davis home.

Defendant showed up at the Davis home the morning of December 12, 1984, and she told him that the police had been there. Defendant left running out of the front door and told her that he had to leave. She heard from defendant a couple of weeks later when he called, telling her that he was on the move and was, at the time, about five states away. Defendant and Bonnie Davis eventu-

ally were arrested in Champaign, Illinois, in June, 1985.

Defendant's trial began on April 8, 1986. Defense counsel did not move prior to trial to sever any counts of the information. As indicated, on April 16, 1986, the jury rendered verdicts. In the context of this evidence, defendant raises five issues on appeal.

First, defendant claims that the prosecutor used only innuendo and hearsay testimony to demonstrate defendant's involvement in drug trafficking and improperly referred to his girlfriend's (Bonnie Davis') home as defendant's drug house. We disagree. This claim of error is without merit. In the first place, this was not a case where defendant was charged with drug violations. These charges and convictions were all murder related. The drug-trafficking testimony was only in connection with the prosecutor's theory as to the motive for the Anderson murder. In fact, the trial judge instructed and cautioned the jury that the evidence of defendant's drug trafficking was for the limited purpose of demonstrating motive.

Furthermore, defendant's claim that the prosecutor used only innuendo and hearsay to show his drug involvement is incorrect. Similarly incorrect is defendant's claim that the prosecutor improperly referred to the Davis home as defendant's drug house. Grover testified as follows:

> *Q.* J. B. [*defendant*] didn't have any dope house; did he?
> *A.* Not as I knew of. He had a house and he had his lady start dealing the drugs out of the house on Rankin Street.
> *Q.* Pardon?
> *A.* Out of the house on Rankin Street he started doing drugs.

*Q.* You said. J. B. had a house where he sold drugs?

*A.* On Rankin Street, yes, sir.

No objection was made to this questioning.

Second, defendant claims that the trial court denied him a fair trial by permitting a police officer to testify concerning defendant's acquisition of a .44 caliber revolver after defendant fled the state when it was not alleged that defendant used the revolver in any of the charged offenses. At trial, evidence of defendant's flight first was elicited from his girlfriend, Bonnie Davis. She testified that defendant left running out of her home on December 12, 1984, after she told him that the police had been at her home. She further testified that she heard from defendant a couple of weeks later when he telephoned her saying he was about five states away from Michigan. After a series of more phone calls, she met defendant in Phoenix, Arizona, where she purchased a Cadillac for defendant. Apparently, she also gave defendant her deceased husband's identification papers which enabled him to travel about the states under the name of Tyrone Davis. She left the Cadillac with defendant and returned home. She next saw defendant in Champaign, Illinois, sometime around June, 1985, and it was there that both she and defendant were arrested.

Later in the trial, a police officer testified concerning defendant's arrest in Champaign, Illinois, and his transportation of defendant back to Michigan. The officer testified that, in addition to transporting defendant back to Michigan, he also carried with him defendant's personal property, including a driver's license, social security card, a Blue Cross card, all of which listed Tyrone Davis' name, and a number of receipts. This was done

over defense counsel's objection that the officer's testimony was hearsay, because he lacked personal knowledge of where the receipts were found, and that the testimony was immaterial. The officer continued to testify about the receipts, including one from a jewelry store in Phoenix, Arizona, for the purchase of a revolver, holster and ammunition. Defense counsel again objected, arguing that the officer was testifying without personal knowledge of the receipts, since he did not retrieve them from defendant or the person who issued them, and that the evidence was immaterial to the offenses with which defendant was charged. The prosecutor argued that Grover established that defendant had no guns of his own and that the evidence was relevant to defendant's flight.

The court stated:

> *The Court:* I'm overruling the objection. This was material he brought back with the Defendant. It's quite clear that the Defendant was in Phoenix, Arizona.
> He was using the name of Tyrone Davis, which Bonnie Davis testified to, which was her deceased husband's name.
> In fact, he took some of Tyrone Davis's documents with him. It's entirely relevant. I overrule the objection.
> Let's bring the jury back.

The officer proceeded to complete his testimony and stated that a receipt for a .44 caliber bulldog revolver and the revolver itself were found among defendant's property. After attempting to admit into evidence a photograph of three guns, including the .44 caliber bulldog revolver, the prosecutor withdrew the photo and moved on to a new line of questioning. Again, this was all done over defendant's objections.

Defendant contends that the evidence of the .44 caliber bulldog revolver, including the receipt for its purchase, was inherently prejudicial, inflammatory and irrelevant. He argues that the revolver was not connected to the crimes with which he was charged and that the evidence of the revolver should have been excluded from trial. The prosecutor contends that the testimony concerning the .44 caliber bulldog revolver was relevant and material to defendant's flight. The prosecutor further argues that it was at best harmless error, given the overwhelming evidence of defendant's guilt.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[1] Here, it is undisputed that evidence of defendant's flight from Flint was admissible, relevant and material and could properly be considered by the jury as an inference of defendant's guilt.[2] However, evidence of the .44 caliber bulldog revolver and the receipt for its purchase probably served no probative evidentiary purpose at trial.[3]

However, in the within case, the direct and circumstantial evidence of defendant's guilt was strong and overwhelming. In contrast, the testimony that was admitted in error constitutes such a small portion of the evidence against defendant that it is wholly unlikely that without it one juror would have voted to acquit. In view of this, we believe any error here was harmless.

Third, defendant claims that defense counsel's failure to move for a severance of the nine counts of the information and suppress evidence of the

[1] MRE 401.

[2] *People v Van Sickle,* 116 Mich App 632, 636; 323 NW2d 314 (1982).

[3] *People v Philip Drake,* 142 Mich App 357; 370 NW2d 355 (1985).

assaults upon Renaldo Hutson and Lisa Carr denied him effective assistance of counsel. Offenses may be joined for trial where, as here, they " 'are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.' "[4] The charges against defendant resulted from a series of offenses that began late in the evening on December 10, 1984, and continued to the morning of December 11, 1984. As a result of those offenses, defendant was charged with conspiracy to commit murder and arson, breaking and entering with intent to commit murder, two counts of first-degree murder, three counts of assault with intent to murder and felony firearm. These offenses occurred in succession and appear to have been prompted by defendant's intent to retaliate against those who had "disrespected" him. It is unlikely that defense counsel would have obtained a severance even if he had made such a motion. Under these circumstances, we see no error requiring reversal in failing to move for severance.

Defense counsel's failure to object at trial to the evidence of the assaults upon Renaldo Hutson and Lisa Carr may have been a mistake, but not so serious as to deny defendant a fair trial. Contrary to defendant's contention that both assaults were of minimal probative value, the record demonstrates that the assaults were relevant to the counts of the information. Renaldo Hutson was shot at because defendant and Grover believed he was Robert Anderson. Lisa Carr was assaulted shortly after defendant firebombed and shot at Robert Anderson's home. These assaults were clearly committed during the wake of violence that occurred between December 10, 1984, and December 11, 1984, and evidence of them was

---

[4] *People v Tobey*, 401 Mich 141, 153; 257 NW2d 537 (1977).

relevant and admissible at trial.[5] In fact, these assaults seem to have been part of the res gestae. Furthermore, absent evidence of the assaults, we do not believe that defendant would have had a reasonable chance of acquittal or that the result would have been different.

Fourth, defendant claims that the prosecutor's conduct at trial served to deny him a fair trial. "The test of prosecutorial misconduct is whether defendant was denied a fair and impartial trial."[6] Questions of prosecutorial misconduct are decided on a case-by-case basis, and this Court must evaluate the wrongful act in the context of the record.[7] Defendant contends that the prosecutor acted improperly in several instances. First, defendant argues that the prosecutor repeatedly led Officer Woods on redirect examination, disparaged defense counsel's cross-examination and offered his own unsworn testimony. So viewed, the conduct complained of on appeal is trifling and not of such a magnitude as to require further comment in this opinion. We reject defendant's claims.

Fifth, defendant claims that the trial court denied him a fair trial. Measuring his objections against the record satisfies us that defendant's claims are without merit.

Sixth, defendant claims that the court improperly instructed the jury on the requisite intent on the charge of assault with intent to murder. No objection to the jury instruction was made by defense counsel in the trial court prior to deliberations. Although an accused has a right to a properly instructed jury, the failure to object to an

---

[5] MRE 401, MRE 402.

[6] *People v Bairefoot,* 117 Mich App 225, 228; 323 NW2d 302 (1982).

[7] *People v Callington,* 123 Mich App 301, 305; 333 NW2d 260 (1983).

allegedly erroneous instruction precludes appellate review absent manifest injustice.[8]

Despite defendant's failure to object at trial, he now contends that the court improperly instructed the jury on the requisite intent for assault with intent to murder. He argues that the court's instruction that intent to place a person in fear of being murdered allowed the jury to convict defendant on all three assault charges with less than the specific intent to murder.

The court instructed the jury as follows:

> The next offense that I will instruct you on is what is called assault with intent to murder. And that applies to Count IV, as to Barbara Anderson; VII, Alpha Breed; and VIII, Ladale Woods.
>
> In each of those Counts, the Defendant is charged with the crime of assault with intent to murder. Any person who shall assault another with the intent to commit the crime of murder is guilty of this crime. The Defendant pleads not guilty to the charge in each of those Counts.
>
> To establish this charge, the prosecution must prove each of the following elements beyond a reasonable doubt.
>
> First, that the Defendant tried to physically injure another person.
>
> Second, that he had the present ability to cause an injury, or at least believed that he had the present ability.
>
> Third, that at the time he committed the assault, the Defendant intended to kill the complainant under circumstances that did not justify, excuse or mitigate the crime.
>
> The crime of assault with intent to murder

---

[8] *People v Lambert,* 395 Mich 296, 304; 235 NW2d 338 (1975); *People v Barr,* 156 Mich App 450, 463; 402 NW2d 489 (1986); *People v Stokes,* 134 Mich App 146, 150; 350 NW2d 767 (1984). Contra, *People v Watts,* 149 Mich App 502, 515; 386 NW2d 565 (1986), lv den 425 Mich 885 (1986); *People v Kohler,* 113 Mich App 594, 599; 318 NW2d 481 (1981).

cannot occur if the assault took place under circumstances which, had the person died, would have reduced the charge to manslaughter.

The crime of murder is reduced to manslaughter if the killing was committed under the influence of passion or in heat of blood produced by an adequate provocation, and before a reasonable time has elapsed for the blood to cool.

If you find that the crime would have been manslaughter had death resulted, then you must find the defendant not guilty of assault with intent to murder.

\* \* \*

Now, as I have told you, these offenses, each and every one of them, including even the carrying of a firearm, is what we call a specific intent offense. The crimes charged in this case require proof of a specific intent before a Defendant can be convicted.

The Defendant must have had more than just the intent to do certain physical acts. He must have done those acts with the desire or knowledge that a certain unlawful result would occur.

\* \* \*

As to assault with intent to murder, he must have intended either that the person be in fear of being murdered or that he intended to put that person in fear of being murdered.

\* \* \*

As to assault with intent to murder, there must be the intent either to put the person in fear of being murdered or intent to murder the individual.

Here, after properly instructing the jury on all the essential elements of an assault with intent to murder, the trial court erroneously instructed the jury that either an intent to murder or an intent to place the victim in fear of being murdered was sufficient to find defendant guilty of the assaults

upon Barbara Anderson, Officer Ladale Woods and Alpha Breed. A defendant is guilty of assault with intent to murder only if there is an actual intent to kill.[9]

While the jury instructions must be read as a whole and may not be extracted piecemeal in an effort to establish error requiring reversal, we believe that the court's instructions were misleading.[10] The instructions may have permitted the jury to convict defendant of the assaults on less than the required intent to murder. Consequently, we reverse and remand for a new trial defendant's convictions of three counts of assault with intent to murder.

Otherwise, we affirm defendant's convictions and sentences for conspiracy to commit first-degree murder and arson, arson, breaking and entering with intent to commit murder, two counts of first-degree murder and felony firearm.

Affirmed in part, and reversed and remanded in part.

[9] *People v Guy Taylor,* 422 Mich 554, 567; 374 NW2d 1 (1985).

[10] *People v Wesley,* 148 Mich App 758, 761; 384 NW2d 783 (1985), lv gtd 425 Mich 872 (1986) (sentencing issue).